All right, good morning to all of you. We're delighted to see all of you here and looking forward to digging into these cases. We'll begin with Appeal Number 24-2104, Frederick Jackson. When you're ready, Ms. Goldman. Good morning. May it please the Court, my name is Lisa Goldman and I represent the appellant, Frederick Jackson. This case is a disputed fact case. Summary judgment and qualified immunity must be denied when material facts are in dispute and qualified immunity must also be denied when it was clearly established that weapons reserved for active resistance were used and cannot be used on a compliant or passively resistant suspect. The correct standard of review to apply is de novo in determining whether a district court's decisions on summary judgment and qualified immunity should be reversed. Can I just ask before you get too further in, you are not appealing the district court's decision on the Monell claim, property damage, and failure to intervene, correct? I am appealing on the failure to intervene claim, I'm not appealing on the Monell claim. The property damage claim, I'm not going to be arguing today. I'm sorry but are you still appealing it though, the property damage? No. So this court should reverse the district court's grant of summary judgment and decision on qualified immunity for three reasons. First, the material facts show that defendants lacked probable cause to believe Jackson fired a weapon from his garage or driveway supporting Jackson's unlawful arrest claim. Second, because reasonable jurors could conclude the video evidence shows Jackson was compliant for only passively resisting at the top and bottom of the stairs and the jury could reasonably conclude that the use of exact bullets which are reserved for active resistance were uses of excessive force, then summary judgment should have been denied as there are disputed issues of fact. Third, this court should reverse the district court and deny defendants qualified immunity for shooting Jackson at the bottom of the stairs because it was clearly established that officers cannot use baton launchers, a use of force reserved for actively resisting suspects on a compliant or passively resistant individual who did not pose an immediate threat. First, the facts viewed in the light most favorable to Jackson support his assertion that police did not have probable cause that Jackson fired a weapon. Jackson denied firing a weapon that night. No shots were fired into the ceiling of the garage as Officer Laredo alleged because the garage door was not damaged and the garage door was up and everybody concedes that. Even Detective Parr, whose deposition was taken after the trial in Jackson's case, conceded that no shots were fired in the garage. No gunshot residue was found on Jackson's hand or even tested for it. The guns in the home were not tested to show that they had even recently been fired. No shell casings were found in the garage or driveway or yard and the police were in all three areas, certainly the yard and the driveway for over six hours. The officers who asserted they heard gunshots were blocks away from Jackson's home when they asserted they heard gunshots and a reasonable officer would not have believed Jackson fired a weapon based on his neighbor's statements because he said he did not see Jackson with a gun and all he saw was a vehicle drive by when he heard something. One officer even said he thought he heard a hammer on concrete. So a jury could decide the officer's versions of events cannot be true. A reasonable jury could find the officer's assertions of shots fired were not credible or that their beliefs were not reasonable. All of the facts... Can we distinguish among those different formulations, counsel? Your appellate brief argues pretty prominently that in response to the probable cause arguments that you think the jury could find the officers were lying. Correct. Can you show us where in your district court materials you made that argument to the district court? Sure. In the proposed findings of fact, and the defendants conceded that Jackson had asserted he did not fire a gun that night and that it was patently impossible for the gunshots that Laredo asserted he saw in the garage to have been fired in the garage. And the defendants conceded those facts. Additionally... So you mean for purposes of summary judgment? Yes. And additionally, Jackson won his criminal trial where that's exactly what was proved in the transcript from the jury trial was in... Right. So I'm... Okay. I'm trying to distinguish between officers who were mistaken and officers who were lying. Where did you make that argument to the district court? I don't have my district brief in front of me, sir, but I'm happy to address it after the oral argument. We looked and didn't find it. It was made in the district court that the officers were lying and the defendants addressed it... The defendants addressed it in their reply brief and I believe I made reference to that in my appellate brief here that the defendants addressed the argument that Laredo was lying in their reply brief. Which brings me to... But here in docket 44, that's the plaintiff's findings of fact. There is representation that the argument that the gun was not actually fired by Jackson. And so particularly in your findings of fact, I don't find that the argument that we're making this morning is that the officers were lying. And so that's... And I know that you wanted to point us there, but I just didn't see it in the record. I'm sorry. I don't understand the question. Say again. I don't find it in the record regarding the officers lying. So where did you say that was raised below? It was raised in the district court brief below and the defendants addressed it in their primary brief, in their responsive brief to Jackson's response, in their reply brief to Jackson's responsive brief on summary judgment below that Laredo was lying about shots fired in the garage. They actually addressed that in their district court brief and on rebuttal, I'm happy to find it while I'm sitting through the opposing counsels and give you that fact. So all of the facts that occurred before the police created a SWAT response are deeply disputed and as this court stated in Payne v. Polley over 20 years ago, where the parties present two vastly different stories as they do here, it is almost certain that there are genuine issues of material fact in dispute. And I should point out that the defendants conceded all of the disputed facts that I'm raising today. They conceded that Jackson stated in his declaration he didn't use a gun that night. They conceded that there was no gunshot residue on Jackson's hands and that he wasn't tested, that the guns in the home were not tested and that Mitko said he did not see Jackson with a weapon or fire a weapon. So those facts were sufficient facts to survive summary judgment on the purposes of the unlawful arrest claim. Moving to the second reason why this court should reverse the district court is that a jury could conclude the video evidence alone shows Jackson was compliant or at most only passively resistant when he was shot at the top and bottom of the stairs and was not an immediate threat for two reasons. First, he was unarmed and nearly naked with his hands up and empty. Second, there were no weapons in sight that he could have grabbed to harm police, meaning he was not an immediate threat. The officers are asserting he was an immediate threat because he could have gone somewhere to get a weapon, but the police could have responded to that at that time. As this court stated in Strand v. Minachewki in 2018, that factual disputes are not to be decided on the defendant's say-so because there was up to 5, 10, or 15 seconds between the time when the suspect stopped beating and choking the officer and when the officer shot, it was a question for the jury as to whether the suspect was still posing an eminent threat at the time of the shooting. Jackson was in front of the officers for almost six minutes before he was shot the third time at the bottom of the stairs, and he never had anything in his arms and he never deviated from his position. Had he been told that they were putting him under arrest? No, they did not tell him they were putting him under arrest. They kept yelling for him, over the loudspeaker, for him to come out. And honestly, a person in their home doesn't have to answer the door to the police. They don't have to come to the door if they're in their home. They didn't have a warrant for his arrest. No, they had consent, though, from his wife, right? Well, his wife denied consent. She said she was coerced because she was in the police station. I know, but there's no indication that the officers on the scene had any reason to doubt that consent, is there? I don't know if there's reason. I may have asked that a little convolutedly. But the officers on the scene were told by the folks at headquarters that she had consented to their entry, correct? They may have been told that, but the issue of consent is a legal issue for the court to decide. No, you're seeking individual liability against the officers on the scene. So what matters is what they knew. Did they have any reason to doubt they had legal authority to enter the house? They had reason to doubt it because Jackson was disputing the initial facts that drew them to the position of having a SWAT response. Thank you. Third, this court should reverse the district court's decision to grant qualified immunity for the shots at the bottom of the stairs. It was already clearly established that an officer cannot use force on a compliant individual and cannot use higher levels of force, like exact rounds, on a passively resistant individual. So what do you do with the language in Dockery? I'm glad you raised that, Your Honor. So the district court asserted Dockery v. Blackburn, citing DeForest v. Prine, supports an officer's use of a high level of force, like exact bullets, on a low level of resistance, like Jackson. The district court erred, and Dockery and Forest, those are cases that took place in a police station or in a jail after arrest, and the Forest decision was decided. I'm relying less on Forest, and Dockery seems more to the point. Sure. The language about, in essence, not compliant with commands and acting in a belligerent manner, which seems like a pretty good description of him at the bottom of the stairs. So it's interesting you raise that issue. In Dockery, the suspect was actually actively resisting in the booking area of the jail. I understand that. But in terms of what's well established, Dockery is saying belligerent and noncompliant. Dockery is saying belligerent and noncompliant in reference to Forest v. Prine, and Forest v. Prine was decided before this court determined that the Fourth Amendment applies to detainees in custody. In Forest, the suspect was in a small cell with guards, and he didn't actually lash out at the guards, although he had struck a police officer before he was arrested, and then the court determined that the Fourth Amendment applied using an Eighth Amendment analysis in Forest. In Dockery, the court cited to Forest. It wasn't the holding in Dockery, and in Dockery, the suspect was actually actively resisting arrest in the jail at the time that that occurred. That's an interesting argument on the merits. My concern is if I'm a police officer dealing with a suspect, am I responsible for figuring out the difference between what's the holding and what's the dictum in Seventh Circuit opinions that directly address this kind of a problem? Your Honor, this court has stated repeatedly, even with higher level of weapons by suspects, such as in Escobedo v. Bender, that a decedent who was isolated in his darkened apartment and suicidal and had a weapon and was pointing the weapon at himself, that in that situation, it was a question for the jury whether he was an eminent or immediate threat at the time the officers used Forest. This court also decided that same situation in the state of Escobedo v. Martin, and the district court in Wisconsin has decided that exact situation with this exact defendant in three other cases, the state of DePiazza v. City of Madison, the state of Robinson v. City of Madison, and the state of Heenan v. City of Madison. So this particular department was on notice for quite some time that it cannot use higher levels of force on a passively or— Those were all—it sounded like all those cases, which I don't remember seeing before, but those were estates, right? Were those people who'd been killed in encounters with police officers? The three district court decisions are estate cases where they were killed, yes. The Escobedo v. Bender and the estate of Escobedo v. Martin, where the estate was, but Escobedo v. Bender was—those were cases of using gunshot, but in this particular situation, these officers used foam bullets, exact rounds, which travel at the same speed as gunshot, and which this court has repeatedly stated constitute a higher level of force than tasers, which were used in Dockery and Forest. I see—I would like to reserve time for a vote. You may. Thank you. All right. Mr. Doa, you can correct my pronunciation when you approach. Thank you, Your Honor. My name is Austin Doan. I represent the City of Madison and the Madison dependents in this case. If there's anything that this court can take away from my oral arguments today, it's that I would ask the court to look at Record Citation 49, paragraphs 20 to 25. Those are the city's proposed findings of fact and then the responses and replies. And in those five paragraphs, Mr. Jackson, appellant, conceded that Laredo, when Laredo exited his vehicle, heard gunshots or heard what sounded like gunshots. They acutely heard at least noise that would warrant further investigation, that Officer Snyder as well heard what could be gunshots. That's enough for exigent circumstances. On top of the fact that officers were relying on a dispatch from— that a neighbor called in to the police department, dispatch relayed that the neighbor reported that Mr. Jackson, the neighbor, was firing weapons. That's enough for probable cause and that's enough for exigent circumstances. I also want to pick up the point that you raised, Judge Hamilton, about the issue of consent. We think that's a strong argument on our end as well because Sherry Jackson lived in a house, owned a house. When the crisis negotiator arrived at the scene— excuse me, made contact with Ms. Jackson, Ms. Jackson relayed consent for the officers to enter her home. There's nothing in the record that Mr. Jackson— Does it make a difference that there's allegations at least raised regarding that consent that she gave that because the officers represented to her, we will not destroy your home if you give us your keys and your garage door opener. And we know now in hindsight, of course, that the front door and the windows were busted out. We cite the United States v. Radcliffe to talk about how— Can you speak up just a little bit? I'm sorry. It's a little hard for me to hear you. The microphone is for the recording, not for the room. We cite the United States v. Radcliffe to talk about the totality of circumstances and how Ms. Jackson never manifested anything objectively reasonable for the officers to presume that she was coerced. But putting that aside, to Judge Hamilton's point, and the district court cites Fitzgerald v. Santoro, officers are allowed to rely on dispatch on a good faith belief. And the command post relayed all the information about the MITCOs calling in, about the gunshot, the neighbor, that the three other officers heard what they thought were gunshots, and that Ms. Jackson gave consent for them to enter the home. There's nothing developed below that would indicate that the officers, Witt, Himhol, Whipperfall, Gonzalez, and Conrad, somehow had reason to doubt that the command post slash dispatch slash the radio was telling them that they had consent. I also want to address quickly the points that Appellant made. The use of force in this case was reasonable because Mr. Jackson was actively resisting. Appellant's whole argument has rested on this premise that he was passively resisting. And I would just go back to what Judge Hamilton, you pointed out, about Dockery v. Blackburn. It's not about whether or not the exact language of Dockery v. Blackburn is whether the plaintiff or the suspect had submitted to the officer's authority, had not been taken into custody, and still arguably could have posed a threat of flight or further resistance. And that's exactly what happened in this case. What further resistance? The threat. When you're standing in the doorway with your arms outstretched. Well, keep in mind, Your Honor, that the officers were operating on the intelligence that four other guns could have been in the house. This was an active shooter call, so they had reasonable intelligence to believe, that Mr. Jackson had been firing a shot. In fact, fired even inside the garage area of the home. Five hours earlier. Approximately five hours earlier or less, Your Honor, yes. But again, when the officers arrive on scene, their first reaction, their first instinct for active shooter cases is to kind of— We're not in that factual—it's fact-intensive. We are five hours later. And so we've got to—I want to start from that premise. We're five hours later, but— And no shots have been fired at least within four hours of time. A stretch of time. Shirley versus Ravenstein, Your Honor, teaches that we don't look at things just in isolation. I take your point, but I would say also the officers have a right to rely on information they accumulated over that five-hour period. And the information that was conceded below was that there were shots, that shots had been fired, that Mr. Jackson has a criminal history that was reported to the officers. Well, I'm getting more so where I'm wanting you to really spend some time is on this notion that there was exigent circumstances. And so in the limited instances where we find exigent circumstances, I'm listening really for whether or not those still existed at the time we're at the bottom of the stairs. And this is something the district court noted in its opinion. Exigent circumstance, one of the recognized— one of the recognized principles of exigent circumstances is danger and safety to the person in the home, so Mr. Jackson himself, and to others. In this case, probably Mr. Jackson's safety, Mr. Jackson has more relevance. But I would also argue the safety of others in the neighborhood. Because officers were operating on the belief or the reasonable belief that there were other weapons in the house, they also couldn't see Mr. Jackson. They don't know this layout of this house. It's a split-level house. So exigent circumstances did exist for them to then deploy nonlethal use of the phone batons in this case in order to get the situation under control, or as Dr. versus Blackburn says, get Mr. Jackson to submit to the author's authority and resist the threat of further resistance. What is—Mr. Jackson takes the position that he was compliant or passively resisting. The city takes the position he was actively resisting. But work with me a minute. What is passive resistance? I look at the cases Mr. Jackson cites. Those are cases of zero resistance, completely docile or incapacitated defendants. We also have notions of active resistance. But what is passive resistance? What is the minimum level of resistance that Mr. Jackson could have exhibited and not be met with rubber and plastic bullets? I think passive resistance is docile, Your Honor. I look at Phillips—go ahead, Your Honor. How is docile being resistant? Well, I mean, I look at passive resistance, excuse me, as being docile. Active resistance on the other end. Jackson's arguing, the appellant's arguing that this was passive resistance. But in Dr. versus Blackburn, being belligerent, cursing, yelling at officers is not passive resistance. That's active resistance. So I was just—on the spectrum of what is active and what is passive, I would say passive on one end is the Phillips case. If you're just laying on all fours— Then you're not resisting at all. Then you're not resisting at all. That's not even passive. That's zero resistance. I would say the language—I'll take that point. I'll concede the point that that's no resistance. But the Phillips case uses the term passive resistance, and that's a circumstance because you're still not complying with the officer's command. In the Phillips case, she didn't get out of the car. They were telling her to please get out—well, they probably didn't say please. But they said get out of the vehicle, and she wasn't getting out of the vehicle. But she also wasn't doing anything like yelling, lashing at the police officers, clenching her fists, being aggressive in any outward manifestation way that would lead the officers to believe that she was actively resistant. And so this court concluded that that was—that the officers in that case acted objectively unreasonable. Now, at the point he shot the third time, he has come down the stairs. So he's complied in that manner. He, of course, took his time. He came when he was ready. He was shot in the middle of all that. He had some pain. He retreated. But he keeps moving forward toward the officers in compliance with their request. I was—I slightly disagree with that, Your Honor. He was partially listening to them to the extent that he was walking towards them. But right before the second deployment—I use the term second deployment for the third shot— the second deployment of the phone batons, he was still—he was actually not even looking at the officers. He was actually looking outside the window on another officer, yelling at the other officer. He was—his hands was, as the district court noted in the opinion, his hands were not up. His hands were side to side in an aggressive stance. And then as—and he did not comply with officers to, quote-unquote, in the words of Docky versus Blackburn, submit to their authority. And so that is active resistance. What are those factual determinations as to whether or not—what degree was he complying or was he complying at all in regards to was he continuing to approach the officers? Was he continuing to comply to some degree? There's some conversation. There is actually conflicting commands being given to come down, turn around, get on your knees, and, you know, stop, keep coming. And so there was a lot kind of happening as to whether factually. I think, though, that there isn't a dispute of fact. We would note that the video speaks for itself. You know, Scott versus Harris states that the court can rely on a video in terms of determining whether facts are disputed or undisputed. The office went—by the time the second deployment of rounds happened, the question of whether or not he should turn around or get on his knees, that is no longer a question because going back to Docky versus Blackburn, the question is, as the district court noted, was he still lashing out officers? Was he being belligerent? Shirley versus Rabenstein is a good illustrator of this. Non-presidential. Fair enough, Your Honor, but I think that the analysis is somewhat helpful for this court in the extent that that was a five-hour standoff, similar to this case. A person was in the—a person refused to come out of the home. It's a barricaded subject. A person falls to the ceiling, says, I give up, officers tase the person. This court recognized that officers have a right after five hours to doubt the veracity of I give up. So, again, it goes back to—I would just go back to the district court opinion when the district court noted that Mr. Jackson, by the time the second deployment of rounds happened, he was still belligerent and aggressive. Had he been told—had plaintiff been told that he was under arrest, or they wanted to put him under arrest? My recollection of the record is no. They were not—at the time they were talking to him, the goal was to defuse the situation and get him to come out of the home because it was an active shooter situation, barricaded subject. So, my recollection is— So, you don't tell him he's under arrest. You just tell him to come out. Right. And, in fact, the city does not contest at this point, Mr. Jackson is not even aware of why the officers are telling him to come out of his house and why they want him out of his house. I disagree with that, Your Honor. Mr. Jackson knew why the police was outside, and this is not fully briefed, but it is in our proposed findings of fact. There's a crisis negotiator that talks to Mrs. Jackson. Through Mrs. Jackson, the police is trying to tell Mr. Jackson come out because it's a loved one. So, that's the idea. So, Sherry Jackson is texting and calling Mr. Jackson, please come out. He texts back—I don't have the exact quote in front of me. He texts back that he knew police officers were outside and tell him to go, tell him to leave. I'm talking about, no, the reason that he's being sought. He's being sought because they believe he fired a gun. No, I know they know why they're seeking him to come out. Does the city contest that he—I don't see any evidence that he knew why. You're talking about evidence that his wife was communicating with him, trying to work with the crisis negotiator while she was kept at the police station under these circumstances. But I don't see anything where the city is acknowledging that Mr. Jackson knew why police were asking him to come outside of what everybody is referring to, his home. It might be a fair point that the officers never explicitly told Mr. Jackson before they made contact with him, we need you to come out because we suspect you've been shooting weapons. But when there's a dispatch call that there's an active shooter right from the neighbor and the officers arrive on scene and they hear gunshots from what they believe to be Mr. Jackson and the Jackson residence, I think it's been taken for granted. You're right, Your Honor. I think everyone just took for granted that Mr. Jackson knew he needs to come out. About five hours earlier, there were gunshots he denies later having ever made. Yes, Your Honor. I think that's, I think we do, I think that we, everyone took it for granted below that. Everyone assumes that Mr. Jackson knew why he needed to go out. I think it's somewhat telling at the end of the video right before he shot the third time, he is told by Officer Conrad, comply, we'll explain it all later. That's right. And that's immediately before he shot again. And Mr. Jackson didn't comply. You know, I would, I don't want to sound like a broken record, but I go back to Doc Rivers' platform where he was belligerent and clenched up or showed aggressive behavior. I do, with four seconds left, I do just want to note and just reiterate again that the question is not, posting it, the question is what the officer's reasoning believed at the time they arrived and confronted the situation, not post-investigative facts. And that's something that the district court harped on. Thank you, Your Honor. Thank you, Mr. Doan. All right, Ms. Goldman. Judge Hamilton, docket 51, page 5. The defendants stated, quote, plaintiff goes so far as accusing Sergeant Laredo of lying about observing what he believed to be a man in the garage firing shots, quote. It was mentioned in the district court. So not you, but what the defendants understood from your argument. Correct. The defendants understood I was arguing that Laredo was lying about shots in the garage. Anybody else? What? Anybody else? I'm sorry? Is there similar argument regarding other officers? Yeah, none of the other officers were near the house when they said they heard shots fired. They were blocks away, and that's facts that's not disputed. There were no exigent circumstances in this case. They were trying to control Jackson into submission, and time is on their side, and that's what all of their training materials teach them. So there was no reason to rush it. Further, Gonzales told Jackson when he was at the top of the stairs, if you come down the stairs, we won't shoot you. He came down the stairs, and Gonzales is one of the officers who admitted to shooting him at the bottom of the stairs. Conrad even testified that he said that Jackson would have been shot if he complied too quickly to what the officers were asking him to do. This court stated in Phillips, citing to Omadaw, that the quantum of force inflicted by a beanbag shotgun, treating it as either deadly force or a higher level of force along the ladder of escalating force, and that's the force that they used in this case. In this court's prior decision in, I see my time is expiring. So for the following, so. You may finish that thought and then conclude. Okay. So this court stated in Ellis v. Walnada, 999 F. 2nd, 243, that even after a suspect threw a bag of stolen items at police officers who were interfering with his robbery, that it was a question of fact whether the officer had reason to believe that the suspect was armed when he shot him after the suspect had turned to run away. So in this particular situation, there's absolutely no evidence that Mr. Jackson had a weapon on him at all. It's certainly not at the time that the video is rolling, and so the shots fired at the top and the bottom of the stairs were uses of excessive force. Jackson requested this court reverse the district court's decision on his unlawful arrest claim, his failure to intervene claim, his excessive force claim, and reverse the district court's decision on qualified immunity for the shots fired at the bottom of the stairs. Thank you. All right. Well, thank you to both parties. We will take the case under advisement.